for the Appellant, Mr. Shiffman, and for the Appellant, Mr. Young. You may proceed. Good morning. Justice Appleton, and may it please the Court, Justice Turner and Justice Connick, your name tags are reversed. I don't know if we can reflect that. We will. I know who you are. Well, it's an honor for me to have Justice Connick. Well, then we'll all proceed with that statement for the record, I guess. I appear this morning for Lori Hardy, who appeals a judgment from the Circuit Court of Sangamon County with respect to issues raised in her dissolution of marriage. I know the Court is fully familiar with the record, especially in this case, because the Court has sent us a little homework assignment with a couple of questions, and I will address those in the course of my argument this morning. But I want to start off initially with the question of the maintenance award in this case. The Court awarded Ms. Hardy 24 months of rehabilitative maintenance with the additional proviso that at the end of that 24 month period, she bore the burden of establishing her right to continued maintenance. This is a clear abuse of discretion. This is an abuse of discretion, first of all, and most importantly, because it fails to follow established case law in Illinois and in this district. This was a 23 year marriage. During the course of that marriage, Ms. Hardy did all of the things that a traditional homemaker does. She raised two children. She ran the marital home. She subordinated her life for her husband's life and her husband's job. At the end of that 23 year marriage, she found herself, after the party separated, with no education and the inability to find a full-time established job. She went to work cleaning houses. At the time of trial in this case, the economic disparity, the income disparity between Mr. Hardy and Ms. Hardy was greater than 6 to 1. He earned approximately $125,000 a year. She earned less than $20,000 a year when she even earned that much. He had a 401k plan, which I will speak to just in a few moments. He had health insurance benefits. She had none of those things. She had to pay taxes out of her cleaning business's salary. She had no insurance. She was eligible for COBRA, which would have cost her roughly $500 or $600 a month. Even the $2,000 a month award, even that award is substantially less when the court takes into consideration that she would pay taxes and she would be forced to pay her own health insurance out of that amount. It was closer to $1,000 a month than to $2,000 a month. And then to add the greater insult to it, in roughly a year, a year from today, she must come back to the Circuit Court of Sangamon County and establish that she has a continued right to receive that maintenance. That is not in accordance with the law of the state of Illinois. Now, I will indicate this. I know it's always harder to prove a negative than it is to prove a positive. But in reading maintenance cases, and reading quite a few of them, and in my experience as an attorney, I must tell you I have never, ever seen a case where a party has to come back to court in two years and bears the burden of establishing their right to continued maintenance. I'm sure there are some, but I've never seen one. And I certainly never saw a reported decision along those lines. The court may be familiar with one, but I am not. But more importantly, the case law of this district, Culp, Drury, Selinger, clearly established that Ms. Hardy should have received permanent maintenance. You look at those three cases, you look at them, you find marriages of substantially the same length as we had in this case. And you find spouses who were awarded permanent maintenance, all of whom were in far better financial situation than Ms. Hardy is in this case. In Culp, the party receiving permanent maintenance earned about $17,000 a year. She had a second job. She had health insurance and a 401K. In Drury, the party receiving permanent maintenance was a teacher. She earned about $30,000. The financial disparity between the husband and wife in each of these cases was far less than the 6 to 1 ratio we have in this case. Ms. Drury was a teacher. She had the benefits that teachers get, retirement, insurance. Ms. Selinger was a registered nurse. She earned approximately $30,000 a year. In that case, the financial disparity was $110,000 to $30,000. All of those three women happened to be women. Each and each of those cases was awarded permanent maintenance by this court. Certainly, Ms. Hardy should get that same consideration. This was a clear abuse of discretion. And when you factor in the fact that Ms. Hardy essentially received nothing, there was no marital estate here. The 401K that the court has raised the question about was awarded to Ms. Hardy. Now, there's nothing in the record to specifically address this $6,000 loan. But I want to suggest to the court that if you go and you read the rules regarding 401Ks in the IRS, and I think the court can take judicial notice of the rules and regulations of the Internal Revenue, a 401K is slightly different than a loan. If I go to a bank and I borrow $50,000, the bank might very well say to me, what will you pledge as collateral for this loan? And I might tell them my home or I might tell them stock or whatever it is. But when you take money from a 401K, you take your own money. The rules and regulations clearly say you cannot borrow money from a 401K unless it is vested. And you can only borrow them under certain circumstances. And the circumstance under which they were borrowed here was financial hardship. You don't really borrow money from a 401K. You get the use of your own money from a 401K. And what happens is that you then, because the IRS says, well, if you're taking your own money back from a 401K, technically that's income. And because what you put into a 401K is not taxed as income, if you took it out early, it could be treated as income. So the IRS calls this advance of proceeds a loan. And the IRS has a specific process whereby you must pay that money back. And one of the ways you pay it back is your regular contributions to the 401K go to reduce the amount of the loan. And I believe what happened here, because it would be the only logical explanation, is that when the 401K was awarded to Ms. Hardy, she got the net proceeds. At some point, if the 401K, as an example, had been at a value of $25,000 and Mr. Hardy took out $6,000, that would reduce the value of the 401K. The people who hold that 401K, the employers, are not going to give you back money that you have already borrowed. It's a similar situation to a cash value of a life insurance policy. If you take cash from a life insurance policy before your death, you don't get that money back. And then with the promise to the insurance company, I'll pay back the loan later on. So the answer to the court's question is, how was this money paid? I think it's this. The marital estate paid it before it was distributed to Ms. Hardy. Mr. Hardy probably paid some of it after he borrowed the money back in regular payments to his employer because that's what the IRS code calls for. And the net amount that was awarded to Ms. Hardy took out any remaining loan balance. So she wouldn't affect the marital estate paid for the 401K. I want to make sure I'm following. So it isn't owed back then? The $6,000 is where? It reduces the amount of money in the 401K. It's awarded though. It's awarded. But when it is awarded, is it $16,000 or is it less? No, I believe it is $16,000 only because I do not believe that the company that holds the 401K would give you money that you owe them with the understanding that you're just going to pay back the loan. It's not really a loan in that sense of the operation. Counsel, so you're essentially arguing generally that there was $22,000 in the 401K? At some point there was. So there was a greater amount reduced by what the parties took in advance. And the parties used that to pay off marital debts. That was the testimony in the record. But when the award was made to Ms. Hardy, there was not $16,000 subject to a loan. There was a net amount. And you're happy with that? Yes. Well, we're not happy with it. But that's how you answer the question. Now, I want to address the maintenance issue just a little bit further by pointing out what I think is probably another very difficult part of this case. And that is the fact that the trial court, when it made its determination, didn't list any factors. I know that this court and reviewing courts always are happier when factors are listed. And you go through the factors. I'm not going to go through the factors. The court knows what the factors are. The length of the marriage, the lifestyle of the parties, all of those things. The court never addressed them. And Mr. Hardy in his brief doesn't address them either. He mentions them. He says, well, these are the factors. But he can't point to one of those factors. There isn't one of those factors. One of those statutory factors today that I can point to, I think that this court can point to, that counsel can point to, that really cuts in favor of this determination. Now, I'd like to also address, and I'm going to address the other question the court raised regarding the attorney's fees, because basically we have been told, and I think very appropriately, that when you look at an attorney's fee award, some of the factors with respect to distribution of property, the statutory factors, also come into play. And as I've already mentioned, Ms. Hardy received basically, there was no marital estate of any significance in this case. And the piece of marital property that she received, the 401K, if she liquidates it, she must pay taxes on it. Because now it clearly will be income by the IRS. She must pay taxes on it. And she has attorney's fees, and she has health debts, and she has all of those things. So essentially she received nothing, very limited property, from the distribution of the marital estate. Was Ms. Jenkins' fees, were they paid for? Some were paid using borrowed money. Is there a balance due to Ms. Jenkins? I believe there was still a balance due to counsel in this case. The 401K, once liquidated and taxes were paid, would leave very little for Ms. Hardy of any nature. But I do want to address the second question that the court raised to us regarding how the attorney's fees issue was handled. The trial court in its docket entry said each party would be responsible for their own attorney's fees. That docket entry was dated December 13th, on the same day the judgment was entered. And in the judgment it says, the parties agree that they will pay their own attorney's fees. Now we have a conflict between the docket entry and the judgment. This court has to resolve that conflict. But I would suggest that the conflict has been clearly resolved by the conduct of the parties subsequent to that judgment order. After the judgment order was entered, a notice of appeal was filed. The notice of appeal is in our brief. And the notice of appeal clearly reflects that the issue of attorney's fees was one of the issues we were raising on appeal. There was a cross-appeal filed. In my brief, in my opening brief, on the issue of attorney's fees, I clearly indicated, I believe in the first paragraph of my brief, what had happened. Docket entry, each party pay their own attorney's fees, and judgment order that talked about the parties agreeing to pay their respective attorney's fees. We raised the issue in our brief. I waited to see what the response would be. The response was that the trial court's decision regarding attorney's fees was not an abuse of discretion.  There was never a suggestion from opposing counsel that the issue of attorney's fees was somehow not properly before this court because the judgment order said the parties agreed to pay their own attorney's fees. Both sides have treated this issue as it is, as though it is an issue. It was, I guess, a very long-winded way for me to say, I believe that the judgment was a scrivener's error, that the parties did not agree that they would each pay their own attorney's fees. They want this court to rule on whether or not it was appropriate for Ms. Hardy not to receive any attorney's fees with respect to this case. And I believe that the record establishes, again, going back to the financial status of the two parties here, that Ms. Hardy should have received attorney's fees in this case. Do you know how much your client still owes in attorney fees? I do not know the exact amount except for the fact that I know she's borrowed three, four, somewhere in the range of $4,000 or $5,000. And I know, quite honestly, Justice Turner, she has attorney's fees for this appeal. So I know that there are still attorney's fees that need to be resolved. And essentially, she had to borrow the money for those attorney's fees. Briefly, the last issue is the issue of cohabitation. The trial court did make rulings with respect to that issue. The evidence was conflicting, the trial court said. The reading of the record, I think, indicates that the court was somewhat disturbed by some of the testimony that it heard from the children regarding this issue. Mr. Ross and Ms. Hardy had a relationship. And by the way, the fact that it has been suggested in the brief that we stipulate that they had a relationship, I believe what we stipulated, too, was that their Facebook page had said that they were in a relationship. Well, that takes care of that, then. Obviously, we'll take judicial notice of that. If this court would like to be the first court in the land to establish the precedence of a Facebook relationship as establishing cohabitation, I will... You'd have to first of all assume that any of the three of us know what Facebook is or have ventured onto it. Actually, probably not, for many wise judicious reasons. But the relationship between Ms. Hardy and Mr. Ross in this case may have had some romantic application. It was more of a business relationship. Mr. Ross worked for Ms. Hardy. She needed somebody to help her with many of her cleaning projects. He did so. They had a financial relationship because he did lend her money. And his father also lent her money. But the trial court determined that this was not sufficient enough of a relationship to establish cohabitation. If you apply the statutory factors and if you apply the cases, every case that has discussed this, and I know it's a case-by-case basis, but I would simply suggest to the court that all of the cases that have discussed cohabitation, the relationship between the parties is far stronger than the relationship that existed in this case. So unless there are questions... You made your point very well about the disparity in income and her economic straits. But let me ask you, if a trial judge believes that rehabilitative maintenance, whatever that is, because it is in the statute, but we know generally what the message is, I'm going to give you maintenance for 24 months. I'm calling it rehabilitative. Silence. That's it. Who bears the burden in two years? I would say that in two years, the party that is paying maintenance bears the burden of establishing that the other party is no longer entitled to maintenance. Now, I will... Okay, go ahead. Let's assume for the moment that it's realistic from the outset that it be a period of rehabilitative maintenance because there is at least a good opportunity for further education or further employment. And the trial judge says, look, I'm giving you maintenance for this period. When we come back to court, you're going to have to demonstrate that you still are entitled to maintenance. Who bears the burden then? I think under those circumstances, the party that wants the maintenance might very well... I thought maybe I misunderstood what you said. You said you'd never seen a reported case where the burden was on the party receiving the maintenance. I've never seen a case... No, no, no. I have never seen a case where after a two-year period of time or even a very brief period of time like that, the party who receives the maintenance must come to court and establish their continued right to receive that maintenance. Now, by an allocation of the burden of proof. In these types of cases, allocating the burden of proof or allocating the burden of going forth with the evidence may just be an exercise in... It may be a meaningless exercise because the burden of proof in dissolution cases is kind of... Yeah, but the burden of going forward, you said. Well, yes, the burden of going forward... You've got to marshal your resources to demonstrate something or you wouldn't be going forward. And I can understand a circumstance where a court might say, all right, for example, in this case, Ms. Hardy had no college education. Maybe she had expressed a desire to, for example, to become a nurse, to continue her education in that respect. And if she had said, I found a program that will allow me to do that in four years, and the court said, okay, I'm going to give you the four years and then we'll do that. And then we'll review it. And we'll review it, yes. But that was not done in this case. And I think that not doing that in this case, coupled with all of the other factors, is a clear abuse of discretion. Thank you. All right. You may proceed. May it please the Court, Counsel, I represent Mr. Hardy in this matter. Addressing the two questions that the Court asked about, the $6,000 loan on the 401K, Mr. Schiffman's brief indicates that Mr. Hardy testified at trial and Respondents Exhibit 12 indicated that he was responsible for that loan. I know it's not in the record, but Mr. Hardy is continuing to pay on that $6,000 loan against the 401K today as we speak. So the 401K will theoretically increase in value? It will be returned. The loan will be returned. I believe what happened was she received the $16,000, the balance of the 401K, but since there was a loan against it, Mr. Hardy was responsible for repayment of the loan. She received the net proceeds of that 401K at that point in time. And who is he paying the loan back to? To the lender. To the lender. I think she received the proceeds to do what she wanted to. Sir, this isn't in dispute. That's not in dispute, no. Mr. Hardy. We were just confused. I believe so, and I think the record isn't very clear. Well, if your client pays this money back, is that going to increase the value of the 401K? I don't believe so. I don't believe so. I think it's just paying it back into his 401K.  So if your client didn't pay it back, then it would reduce the value of the 401K. I think she got the net proceeds in her own separate 401K account, and he had to return the money that was borrowed to his 401K account. With regard to the attorney's fees, I believe it was just a Scribner's error. So it's still in dispute. It's still in dispute, to answer those two questions. I'll take my argument a little bit out of order to match Mr. Shiffman. In regard to the award of maintenance, I don't think it was an abuse of discretion. Permanent maintenance may be appropriate where the spouse was insulated from developing her skills or career, and special consideration should be given to spouses who have undertaken to have children, raise and support the family, and forego employment opportunities while the spouse is still in employment. The other spouse pursues their career. In this case, I think the evidence wasn't clear as to what exactly was going on. I believe the evidence shows that Ms. Hardy was not a homemaker, was not raising the children. The parties agreed that she would stay home and raise the children until they were of school age. When the parties got divorced, the children were both adults, 20 and 25. The evidence showed that after the children went to school, Mr. Hardy encouraged her to return to school to further education. He even got her to enroll in classes at one point, but she quit. He found her employment. She quit. She didn't ever seek to further her employment because he took care of all the finances. He paid all the bills. He did all of that nature. She didn't know anything about it. I hate to say it, but she was admittedly having a substance abuse problem during that time period. Their daughter testified that she felt neglected as a child and that her mother wasn't completely there for her. I don't think that is the type of permanent maintenance, insulating and raising the children that the court had in mind in terms of permanent maintenance. Even if all that's true, though, why isn't she entitled to maintenance? How is she going to rehabilitate herself? I think the Illinois Marriage and Dissolution of Marriage Act provides for rehabilitative maintenance, and it can be awarded to give the spouse an incentive to attain self-sufficiency. I think what Judge Sanchez did in this case was give her two years of maintenance as an incentive to attain self-sufficiency, and at that two years, if she can prove to the court that she has done everything to try and become self-sufficient and has been unable to do so, he would continue maintenance at that point in time. From the evidence in the record, it's clear that without an incentive, she was never going to work. She was never going to become self-sufficient. It wasn't until 2011 when she started her business that she started making any money on her own. The parties became separated in 2008-2009. She relied solely on Mr. Hardy to pay all of her expenses while they were separated. In fact, from 2009 until 2012, he gave her $66,000. She started her business in 2011. She admitted to having an income in 2011 of $5,400. In 2012, at the date of trial, she said her income was $23,000 a year. I think Judge Sanchez was trying to give her an incentive to continue working on your business, and we'll see where we're at in two years. Counsel, isn't it realistic to believe that $23,000 a year might be pretty much the peak of what she could achieve as far as income given the nature of her business? I don't think so. The evidence showed that she wasn't working every day. There were some days she wasn't working. There was private investigator testimony that there were days when she didn't go to work. She just continued working. It doesn't necessarily mean that it was a full-time job. Given that she got up to $40,000 or $50,000 a year, your client still makes $125,000. Correct. That still would kind of go against your argument, wouldn't it not? I don't think it goes against the argument of self-sufficiency. I think it might go against the argument of $125,000, but there's no evidence that their standard of living was such that $40,000 or $50,000 would not meet that standard of living. Mr. Shiffman and his briefs seem to indicate that a more appropriate – I know he wants permanent maintenance – but a more appropriate award may have been for like four years and then a review with the burden on your client. What do you think about that? It's not a question of what would be more appropriate. It's a question of whether or not Judge Sanchez's order was an abuse of discretion. I don't think the two years was an abuse of discretion. It might not have been what another judge would have found, but Judge Sanchez, after listening to the testimony, felt that two years, to come back in two years, was more – How about the burden aspect of my question? I think the burden aspect – I think it would be hard for Mr. Hardy to be able to prove what Ms. Hardy did to become self-sufficient. I think the evidence is all in her grasp. How difficult would that be? How difficult would that be? You file a petition, you issue a request for production of her last two years' income tax returns, and you've got all the proof you need, right? Just for the income, but it doesn't go into what she did along the way to try and increase her business or things of that nature. That's why God made depositions. Ms. Hardy has shown unwillingness to cooperate with Discovery throughout this case, which I'll address in the attorney's fee section. Discovery was propounded on her in July of 2011. It wasn't answered until midway through trial, despite three motions to compel it and a petition for a rule to show cause. Accordingly, I think it would have been nice had Judge Sanchez made a more elaborate ruling, but I think Judge Sanchez's ruling that temporary maintenance of 24 months with the ability for her to come back and ask for more was not an abuse of discretion. With regard to the cohabitation issue, I believe that any maintenance in and of itself in this case was an abuse of discretion because I feel that Judge Sanchez's ruling with regard to cohabitation was against the manifest way to the evidence. Yes, they stipulated that they were in a relationship through Facebook, but that wasn't the only way she acknowledged the relationship. Through her testimony, she referred to Mr. Ross as her boyfriend. To state merely that it was more of a working relationship, I think ignores pretty much the entire record. So Judge Sanchez knows what he's doing when he analyzes maintenance, but he does no squat about relationships. That's essentially what you're saying because he says, The evidence is conflicting. You haven't proven it. I can't speak for Judge Sanchez, but I think what he was trying to do in this case was, I personally think he might have thought there was cohabitation, but was wanting to give her something because of the disparity in the incomes, and if he found cohabitation, he couldn't give her anything. Because he was only going to give it to her for two years anyway, what's the harm? He gave it two years and gave her the ability to request it additionally. But I think the evidence shows that there was cohabitation without question. Ms. Harney's daughter testified, and counsels talked about Judge Sanchez making comments regarding the testimony of the daughter. It wasn't about the actual testimony of the daughter. Judge Sanchez did make a comment on the record about the counsel for both parties needed to realize who was testifying, and it was their daughter, and that she was emotional and in a bad situation, and not to press things particularly further. Ms. Harney's attorney got Judge Sanchez particularly set off when he started asking her, Well, if he awards maintenance to your mom, isn't that taking money out of your mouth? That sort of thing. And she was getting very upset, and I think that's when Judge Sanchez stepped in. He wasn't making comments that he didn't trust any of her testimony. She lived with her mother and Mr. Ross from 2011 until 2012 when they moved out of the rental home. She testified that Mr. Ross was there all day and all night, spent every night there. He helped with household chores. He helped pay the bills. He helped with groceries. He ate all of his meals there. He shared the bedroom closet with the mother equally. They intermingled their personal affairs. Yes, they worked together, but they watered plants at the house, and I have never worked with anybody where the father of my co-worker would co-sign a loan for a residence for me. I believe that, along with Mr. Ross purchasing the bed, as well as purchasing the refrigerator in the new home, shows that he is establishing his residency there. Yes, he did maintain a mobile home on his father's property, but the courts have held that exclusive residential relationship is not necessary to prove sufficient cohabitation. I think that it's further emphasized by the fact that when the daughter was house-sitting for the mother after she had moved into the residence, there was text messages admitted into evidence where the mother directed the daughter, don't sleep in the bed. You know Rob doesn't like spending people sleeping in his bed. He assumed a sense of ownership. Another way to show that the de facto husband-and-wife relationship was when Ms. Harney was testifying regarding her home loan, her mortgage on her residence, she specifically stated in her testimony, I don't really know about that. You'll have to ask my boyfriend. It seems to imply that her boyfriend had assumed her role in the finances similar to what her husband had done during the course of the marriage. Her husband had always controlled her finances. Now her boyfriend was controlling her finances. They vacationed together. They spent their holidays together. The daughter testified that the mother's holiday plans had all changed since Rob Ross had come into the picture because she was spending all of her holidays with him. I think the evidence was overwhelming in regard to the cohabitation of the parties. As such, I feel that Judge Sanchez's ruling with regard to cohabitation was against the manifest way of the evidence. When looking at the issue of attorney's fees, I believe that Judge Sanchez in this instance felt that both parties should pay their own attorney's fees because of Ms. Harney's delay and protraction of the litigation. This case was a motion to compel on the discovery that I previously discussed had been granted and she was given 14 days to produce the discovery and to appear at final hearing July 17th. The discovery hadn't been provided at July 17th and on July 17th, a brand new attorney showed up that morning not ready for trial requesting a continuance. Ms. Harney wasn't even there at trial at that point in time. She had to be called and summoned to court to appear. She requested a continuance and a continuance was granted until 1.30. At that time, Judge Sanchez admonished the parties that the issue of attorney's fees for the wasting of time that Ms. Harney had done would be addressed at the end of the case. Was it? I think it was when the judge ordered that both parties... Well, isn't that... I mean, it's the same with the... You know, we're supposed to read in the nuance that yeah, they probably were cohabitating, but since I'm only doing the two years of maintenance, what's the harm? And this is what I'm going to do with attorney's fees, but I won't say anything about it. I mean, I'm going to take all this into account, but I'm going to make it a secret to the appellate court. I mean, it's almost like we have to divine what was going on in the court, which sometimes we do and we do it correctly. Sometimes we do and I'm sure we're wrong. So it's always helpful for the trial judge to say, look, this is the reason I'm giving you 24 months of maintenance. This is the reason I'm awarding attorney's fees in this way. I agree. Both of those, if Judge Sanchez would have elaborated on his reasoning, I believe that this would have been a lot easier process. But I think given the evidence and the record, the most logical conclusion is the one I'm presenting forth, is that he considered these aspects and these were his rulings because of that. Is it in dispute about the physical ailments that the ex-wife suffers? Is that in dispute? I don't think the dispute is with regard to her having these physical ailments. Well, if she has these physical ailments and a history of both alcohol and prescription drug abuse, and she's got a GED, just what is it that makes it realistic that you're going to be able to be self-sufficient in a couple of years? It's pretty iffy, isn't it, with that history? Potentially. It could be iffy as to whether she would be able to, but she has never demonstrated, in the little bit of time that she has attempted to work and start her own business, she has increased her business. I think Judge Sanchez was saying, without the push, she's never going to make the effort. She's never going to try. And those physical ailments have not prevented her from working. The physical ailments... Maybe they prevented her from working every day. You said... There was no evidence to that. No evidence to that. There was no evidence to that. The evidence was that in 2010, her doctor, because of these physical ailments and because of the potential contribution of her drug and alcohol abuse, recommended she go to rehabilitation. She attended rehabilitation. Shortly after rehabilitation, her daughter testified that she continued drinking and continued abusing pills. I think... But as for at the time of the final hearings, the most we have is her testimony that, I don't do that anymore. That's correct. Given the fact of the undue delays and the strength drawing the case out significantly, I believe that Judge Sanchez's ruling that both of the parties pay their own attorney's fees was not an abuse of discretion. I think without evidence on the record demonstrating that his rulings were an abuse of discretion, I think it should be affirmed. But I think the cohabitation was against the manifest weight of the evidence. If there's no further questions, thank you. Thank you. Mr. Shiffman, rebuttal. Thank you. Very briefly, this is 2013, soon going to be 2014. This is the 21st century. I must say that somehow the notion that given all of the changes we have had over the past decades in the Marriage and Dissolution Act in the state of Illinois and across the country, somehow the notion that it's okay for a trial judge to tell a woman who has been married for 23 years, who came into the marriage with a GED, who raised two children, who took care of the traditional issues that a woman takes care of in a marital household, to tell that woman at this point in her life, you are going to have to be the one who justifies your need for continued maintenance. You are going to be the one who has to come to the court and keep a record. With all due respect, this ruling almost treats this woman as if she were a criminal. All of us have seen cases where people are on probation, they can't pay their fines, and the judge says, well, I want you to keep a list every day of where you've gone to look for work, and you bring that list back to me every week, and we'll see if you can get a job to pay off your fine. That's not the way the Marriage and Dissolution Act wants to treat people. That's not the way Miss Hardy should be treated. All of this judicial tea leaf reading about what Judge Sanchez thought, and what Judge Sanchez wanted to do, and how he was going to manipulate her by his rulings, is inappropriate. The court spoke through its rulings. Now, the court didn't tell us much. But if the court deemed that attorney's fees shouldn't be paid because a lawyer didn't deserve those attorney's fees, the court should have said so. I think what we have here are the statutory factors to go by. And the statutory factors here suggest that Miss Hardy should have received attorney's fees. And the statutory factors with respect to maintenance, we still haven't heard one. One statutory factor that justifies this award other than, well, she may have been abusing drugs, but that's not a statutory factor. Or she wasn't working five days a week. She was cleaning houses and businesses. Most people, I would suggest, in that line of work do not work every day. This award of maintenance was an abuse of discretion, and this court should reverse it. Thank you. Thank you, counsel. We'll take this matter under advisement and stay in recess for a few moments until the readiness of the next case.